UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

IDELLA M. ABRAM,

                              Plaintiff,

         v.                                          **DECISION AND ORDER**
                                                     04-CV-441S

CITY OF BUFFALO,

                              Defendant.

# I.  INTRODUCTION

Plaintiff Idella M. Abram, proceeding *pro se*, commenced this action on June 14,

2004.  She then was a City of Buffalo (the City) police officer and alleges that the City and

three supervisors discriminated against her and subjected her to harassment on the basis

of her gender, religion, and race, in violation Title VII of the Civil Rights Act of 1964 (Title

VII), 42 U.S.C. §§ 2000e *et seq.*, discriminated against her on the basis of her age in

violation of the Age Discrimination in Employment Act of 1967 (ADEA), 29 U.S.C. §§ 621

*et seq.*, failed to provide a reasonable accommodation for her disability in violation of the

Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12112 *et seq.*, and retaliated against

her for complaining of discrimination or harassment.

On July 20, 2005, this Court dismissed Abram's claim that she was discriminated

against because of a disability sometime in or after 1997 (the ADA claim), and dismissed

all claims against the individual defendants.  (Docket No. 16.)  Presently, before this Court

is the City's Motion for Summary Judgment on the claims that remain.  Plaintiff opposes

1

the motion. For the reasons discussed below, the City is entitled to summary judgment dismissing Plaintiff's complaint in its entirety.

## II. BACKGROUND

### A. Procedural Background

On May 27, 2003, Abram filed a Charge of Discrimination with the Equal Employment Opportunity Commission (EEOC), alleging she was subjected to disparate treatment and a hostile work environment from September 30, 2002 through May 1, 2003, because of her race, gender, religion (Baptist), and age (then 47). (Docket No. 88-2 ¶¶ 4-5, Ex. 1.) In particular, she alleged that she: (1) was treated differently than similarly situated males when she received a 30-day suspension on or about September 30, 2002, (2) was required "to fill [out] a P-73 form while similarly situated yo[u]nger Black females" were not, (3) usually received less favorable assignments from her non-Black supervisors than did younger females, and (4) was singled out and harassed because of her religious beliefs.

The EEOC issued Abram a determination letter and a Dismissal and Notice of Rights, both dated March 10, 2004, in which the agency stated it was unable to conclude from the information obtained during its investigation that any violations of the statutes had occurred. (Docket No. 1 at 6-8.)

Abram timely commenced this action, on June 14, 2004, by filing a *pro se* form discrimination complaint. (Docket No. 1.) Consistent with her EEOC charge, she checked boxes indicating she was discriminated against and harassed on the basis of her race, gender, religion, and age. In response to the requirement that she set forth the facts of her

case, Abram stated only that "within a week or two" after having a conversation with another Police Department employee about that employee's extramarital affair, "I began to be bought [sic] up on many departmental charges by [three of my supervisors]." (*Id*. ¶ 19.) Abram then proceeded to raise, for the first time, claims of failure to accommodate a disability under the ADA and retaliation for complaining of discrimination or harassment. In support of the ADA claim, Abram alleges she first disclosed her disability and sought accommodation on February 26, 1997, and that upon reinjury at some unspecified time, she was denied injured on duty (IOD) status and light duty. (*Id*. ¶ 23.) The Complaint does not identify any conduct alleged to have been retaliatory. The Complaint does not allege any discriminatory conduct other than the purported discriminatory departmental charges and failure to accommodate.

A few months after commencing this action, on September 23, 2004, Abram filed a second administrative complaint, this time with the New York State Division of Human Rights. She alleged that the City discriminated against her because of a disability in violation of the ADA and New York's Human Rights Law (HRL), and retaliated against her for filing an EEOC charge, when it denied her a light duty assignment and IOD status in November 2003. A hearing was held before a DHR Administrative Law Judge in the fall of 2007. On April 22, 2009, the DHR issued a Notice and Final Order rejecting Abram's claims of disability discrimination and retaliation under the ADA and HRL. (Docket No. 88-2, Ex. 7.) Abram filed a Verified Petition in New York State Supreme Court, Erie County, challenging the DHR's Final Order. The Order was unanimously confirmed on March 19, 2010. Abram v. New York State Div. of Human Rights, 71 A.D.3d 1471, 896 N.Y.S.2d 764 (4th Dep't 2010).

Just one day after Abram filed her second administrative complaint, on September 24, 2004, Defendants filed a Motion to Dismiss in this action. (Docket No. 4.) As previously noted, Defendants' motion was granted in part. Abram's ADA claim was dismissed for failure to state a claim, and all claims against the individual defendants were dismissed on the ground that there is no individual liability under Title VII or the ADEA.

On March 6, 2006, Abram filed a third administrative complaint against the City, again with the DHR. She claimed that after filing her 2004 DHR complaint, the City denied her claims for medical benefits, refused to grant her leave requests, threatened to discipline and terminate her if she did not report to work, refused to provide the NYS Retirement System with accurate information about her, and terminated her on March 24, 2005, while her retirement was being processed. (Docket No. 88-2, Ex. 8.) On May 17, 2007, the DHR issued a Determination and Order after Investigation which found no probable cause to believe that the City engaged in retaliation. (*Id*. Ex. 9.) The DHR expressly noted that all of the alleged retaliatory events occurred or commenced prior to Abram's filing of her earlier DHR complaint and thus could not have constituted retaliation.

While Abram's third administrative complaint was pending, on April 11, 2006, this Court granted her Motion for Appointment of Counsel. (Docket No. 27.) Her appointed attorney withdrew from the case on January 30, 2007, and Abram again proceeded *pro se* until she retained new counsel on May 30, 2008. She has been represented continuously since that time, including during her deposition and on the instant motion.

On July 13, 2009, the City moved for summary judgment on the grounds that Abram: (1) is precluded from basing her claims on conduct occurring before and after the time period specified in her EEOC charge, (2) is precluded from asserting claims based on

4

conduct not alleged in the EEOC charge or the Complaint, (3) is unable to establish a *prima facie* case of discrimination with regard to much of the alleged conduct, (4) was suspended on September 30, 2002 for a legitimate, nondiscriminatory reason, and (5) does not allege conduct that rises to the level of a hostile work environment.

In response to the City's motion, Abram has withdrawn her religious discrimination claim. Accordingly, the claims that remain for consideration are discrimination and harassment on the basis of race, gender, and age, and retaliation.

**B.    The Alleged Discriminatory Conduct**

Abram, an African-American female born September 8, 1955, began working as a City of Buffalo police officer in 1985. (Docket Nos. 1; 96 ¶ 1.) She was assigned to the E District sometime in 1997, and certain E District supervisors allegedly began discriminating against her in or about September 2000. (Docket No. 90 ¶ 1.)

Abram attests that, while she was on light duty and assigned to a desk job sometime in 2000, Jenyne Langhorne, a report technician who worked the 11:00 p.m. to 7:00 a.m. shift, began talking about an extramarital affair she was having with Inspector Andrews. Abram told Langhorne she did not want to hear about such conduct, which was adultery and a B misdemeanor offense. (Tr. 17:9-19:11.[1]) According to Abram, within a week or two after this exchange with Langhorne, Inspector Andrews and two other E District supervisors began treating her unfavorably by "mounting . . . departmental charges against [her]," and subjecting her to a hostile work environment. (Tr. 20:9-22-33; Docket Nos. 1 ¶ 19; 96.) In the course of discovery, Abram identified additional alleged incidents of race,

---

[1]  "Tr." refers to the transcript of Abram's deposition. The cited pages appear at Docket Nos. 88-3 and 98.

gender, and/or age discrimination and harassment, beyond those identified in her EEOC

charge and Complaint.  Her specific allegations now include the following:

- *September 16, 2000*　　　　Inspector Andrews notified Abram and another female officer who also was on light duty that he was changing their work schedules (Tr. 18:15-19:15; Docket Nos. 96 ¶ 2; 97-17)

- *In or about 2000 – 2003*　　Abram was the only officer in her platoon who was not permitted to attend certain mandatory training sessions  (Tr.  53:6-59:8)

- *In or about 2002 – 2003*　　Abram  was  denied a "free-floating car," which was available on "double-up day" and should have been assigned based on seniority. (Tr.  10:20-11:9)

- *In and after July 2002*　　When Abram reported late to work or an assignment, she was required to fill out a P-73 form, which she describes as an form of "interdepartmental correspondence used for explanations, complaints"  (Tr. 73:13-17)

- *September 2002*　　On one occasion, Lieutenant Zagara told Abram to "man up," and on another occasion, when she complained of pain, he told her that if she wanted a man's job, she should suck it up (Tr.  63:20-66:6)

- *September 30, 2002*　　　Abram  was  improperly  required  to  work at school crossings, which should have been assigned to a more junior officer, and then was singled out for discipline when she  arrived  late  to one such assignment on September 30, 2002  (Tr. 25:4-26:23; Docket No. 97-9)


## III.  DISCUSSION

### A.　Certain of Abram's Claims are Precluded

The City contends that several of the foregoing allegations are precluded from

consideration because they occurred more than 300 days prior to Abram's EEOC filing,

they occurred before or after the dates identified in her EEOC charge, they are not

reasonably related to the allegations in her EEOC charge, or they are barred by collateral

estoppel.  These arguments are addressed in turn.

**1.    *Timeliness***

"As a precondition to filing a Title VII [or ADEA] claim in federal court, a plaintiff must first pursue available administrative remedies and file a timely complaint with the EEOC." Deravin v. Kerik, 335 F.3d 195, 200 (2d Cir. 2003) (citation omitted).  To be timely, an EEOC complaint must "be filed . . . within 300 days of the alleged discriminatory act." McGullam v. Cedar Graphics, Inc., 609 F.3d 70, 75 (2d Cir. 2010); *see also*, 42 U.S.C. § 2000e-5(e)(1) (Title VII); 29 U.S.C. § 626(d)(1) (ADEA).

"The timeliness of a discrimination claim is to be measured from the date the claimant had notice of the allegedly discriminatory action.  Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 713 (2d Cir. 1996) (citing Morse v. Univ. of Vermont, 973 F.2d 122, 125 (2d Cir. 1992)).  The 300 day filing requirement "functions as a statute of limitations," Quinn v. Green Tea Credit Corp., 159 F.3d 759, 765 (2d Cir. 1998), and is strictly construed in this Circuit, *see, e.g.*, Trenchfield v. DuPont Photomasks, Inc., No. 96 Civ. 1135, 1997 U.S. Dist. LEXIS 1321, at *16-20 (S.D.N.Y. 1997) (Title VII claims filed with the EEOC 338 days after alleged discriminatory employment practice dismissed as untimely); Van Zant v. KLM Royal Dutch Airlines, 870 F. Supp. 572, 575 (S.D.N.Y. 1994) (sexual harassment and retaliation claims dismissed as time-barred where last alleged discriminatory act was 315 days before EEOC filing).  This is consistent with the Supreme Court's view that "'strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.'"  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 108, 122, S. Ct.2061, 2070, 153 L. Ed. 2d 106

(2002) (quoting <u>Mohasco Corp. v. Silver</u>, 447 U.S. 807, 826, 100 S. Ct. 2486, 65 L. Ed. 2d 532 (1980)).

Because Abram filed her EEOC charge on May 27, 2003, her claims are timely only to the extent they are based on conduct occurring on or after July 31, 2002. Thus, it is clear that the alleged discriminatory schedule change in September 2000 is time-barred, as are denials of training and any additional discrete acts of discrimination occurring prior to July 31, 2002.[2]

## 2. *Failure to Exhaust Administrative Remedies*

As noted above, a plaintiff commencing a Title VII or ADEA action ordinarily must exhaust her administrative remedies by first presenting her claims to the EEOC. Failure to do so defeats the purpose of Title VII's statutory notice provision, which is "to encourage settlement of discrimination disputes through conciliation and voluntary compliance." <u>Miller v. Int'l Tel. & Tel. Corp.</u>, 755 F.2d 20, 26 (2d Cir. 1985); *see also*, <u>Burnett v. ESL Fed. Credit Union</u>, 198 F.Supp.2d 307, 314-15 (W.D.N.Y. 2002). Consequently, courts in this district routinely dismiss unexhausted discrimination claims. *See, e.g.*, <u>Byrne v. Telesector Res. Group, Inc.</u>, No. 04-CV-76, 2005 U.S. Dist. LEXIS 7155, at *19, *23-27 (W.D.N.Y. Feb. 25, 2005) (dismissing hostile work environment claim for failure to exhaust); <u>Talyansky v. Xerox Corp.</u>, 22 F. Supp. 2d 55, 57 (W.D.N.Y. 1998) (finding retaliation claim made in EEOC charge was woefully inadequate to satisfy statutory notice requirement prior to bringing suit in federal court), *aff'd*, 182 F.3d 901 (2d Cir. 1999), *cert. denied*, 528 U.S.

---

[2] Abram's testimony regarding most dates is vague (to put it kindly), and it is impossible to tell whether conduct alleged to have begun sometime in 2002 is intended to refer to dates before or after July 31, 2002. To the extent it is the former, allegations of discrete acts of discrimination prior to that date are time-barred.

1020, 120 S. Ct. 530, 145 L. Ed. 2d 410 (1999), *reh'g denied*, 528 U.S. 1132, 120 S. Ct. 974, 145 L. Ed. 2d 842 (2000).

However, "'as a general matter, the failure to exhaust administrative remedies is a precondition to bringing a Title VII claim in federal court, rather than a jurisdictional requirement.'" Francis v. City of New York, 235 F.3d 763, 768 (2d Cir. 2000) (quoting Gibson v. West, 201 F.3d 990, 994 (7th Cir. 2000)); *see also*, Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 n.5 (2d Cir. 2000); Pietras v. Bd. of Fire Comm'rs of the Farmingville Fire Dist., 180 F.3d 468, 474 (2d Cir. 1999). Thus, the requirement can be waived by the litigants or the court. Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393, 102 S. Ct. 1127, 1132, 71 L. Ed.2d 234 (1982); Pietras, 180 F.3d at 474. In addition, courts may entertain claims that, while not expressly raised in the underlying administrative charge, are "reasonably related" to it. *See* Butts v. City of New York Dep't of Hous. Pres. & Dev., 990 F.2d 1397, 1401 (2d Cir. 1993), *superseded by statute on other grounds as stated in*, Hawkins v. 1115 Legal Servs. Care, 163 F.3d 684, 693 (2d Cir. 1998).

In Butts, the Second Circuit discussed three situations where unexhausted claims may be "reasonably related" to properly presented claims: (1) "where the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination;" (2) where the "claim is one alleging retaliation by an employer against an employee for filing an EEOC charge" and (3) "where a plaintiff alleges further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge." 990 F.2d at 1402-03 (quotations and citations omitted).

Here, the City contends that Abram failed to provide sufficient notice in her EEOC charge of disparate treatment in regard to "floating" car and school crossing assignments, and her claim of hostile work environment. In response, Abram notes that the City has not cited to any authority in support of its position. She goes on to state that, in any event, her allegation that she was "suspended, disciplined, subjected to different terms and conditions of employment and subjected to a hostile work environment" (Docket No. 88-2, Ex. 1) is a sufficient predicate for the challenged allegations and claim. In short, Abram appears to contend her allegations are actionable under the first type of reasonably related claim, which essentially is an allowance of "loose pleadings" in recognition of the fact that the charging party often does not have the benefit of counsel. Ximines v. George Wingate High Sch., 516 F.3d 156, 158 (2d Cir. 2008). The City replies with a citation to Fitzgerald v. Henderson, 251 F.3d 345 (2d Cir. 2001), with a parenthetical reference to the reasonably related standard.[3]

    a.    *Disparate Treatment in Work Assignments*

Abram stated in her EEOC charge that "[m]y non-Black supervisors usually give better assignment [sic] to younger females." (Docket No. 88-2, Ex. 1.) However, she did not identify any particular work assignment[s].[4] Abram's general allegation is similar to

---

[3] Frankly, finger-pointing in both directions is warranted with regard to the minimal thought and effort applied to this argument. Though the reasonably related standard is a well-settled principle in employment discrimination cases, that does not give the City a pass to assert a legal conclusion without an iota of analysis or citation. Should counsel take the same approach in future cases, this Court will consider the exhaustion argument waived. Abram has been equally cavalier, brushing off the City's position, but failing to make any real effort to provide analysis or authority for her own position. In the future, if counsel has no supportable counter-argument, he is better served by conceding the point.

[4] The charge specifically identifies a 30-day suspension and Abram's being singled out to complete P-73 forms as examples of disparate treatment. These are of an entirely different nature than alleged incidents of unfavorable treatment in assignments.

those presented in Butts, where the plaintiff alleged that she had "constantly been the target of discriminatory practices and treatment" and was "denied promotional opportunities and consideration based on my race and sex."  990 F.2d at 1403.  In affirming the district court's dismissal of the plaintiff's disparate treatment claims, the Second Circuit noted that:

> Were we to permit such vague, general allegations, quite incapable of inviting a meaningful EEOC response, to define the scope of the EEOC investigation and thereby predicate subsequent claims in the federal lawsuit, such allegations would become routine boilerplate and Title VII's investigatory and mediation goals would be defeated.

Id.  See also, Murray v. Board of Ed. of New York, 984 F.Supp. 169, 176 (S.D.N.Y. 1997) (dismissing failure to promote claim asserted in the complaint where plaintiff's charge alleged only that a demotion "denied me future promotional opportunities").

While precise pleading is not required for purposes of exhaustion, Deravin v. Kerik, 335 F.3d 195, 202 (2d Cir.  2003), a complete absence of specificity defeats a plaintiff's subsequent claims Crespo v. New York City Transit Auth., 01-CV-0671, 2002 U.S. Dist. LEXIS 2977, at *26  (E.D.N.Y. Jan. 7, 2002) ("[s]pecific factual allegations must be made in order for the EEOC to be able to investigate them reasonably").

In this Court's view Abram's vague, "boilerplate" allegation of unspecified favoritism in assignments based on race and/or age are not sufficient to have alerted the EEOC to to investigate allegedly discriminatory floating car and school crossing assignments.[5] Accordingly, these allegations are not actionable.

---

[5] Indeed, while the EEOC clearly investigated Abram's allegations regarding her suspension and the P-73 forms, it's evaluation letter makes no mention of work assignments at all.  (Docket No.  88-2, Ex. 2.)

b.　*Hostile Work Environment*

Abram's allegation of hostile work environment is even more vague: "I believe that I have been . . . .subjected to a hostile work environment because of my gender/ female, my religious beliefs/ Baptist, [ ] my race/ Black, . . . [and] my age/ 47 . . . ."  There are no specific allegations of offensive conduct or comments related to any of the identified protected categories.

This district has dismissed as unexhausted similarly vague hostile work environment claims, and will do so here.  *See, e.g.*, Byrne, 2005 U.S. Dist.  LEXIS 7155, at *23, 26-27 (hostile work environment claim dismissed because allegation in EEOC charge that "the hostile work environment has included many comments and conduct which were offensive and sexual in nature" presented only "vague generalities devoid of any factual basis"); Samborski v. West Valley Nuclear Services, Co., No. 99-CV-0213, 2002 U.S. Dist. LEXIS 12745, at *14-17 (W.D.N.Y. June 25, 2002) (allegations of "sexual harassment" that created a "hostile environment" are boilerplate terms that fail to inform the EEOC of any alleged harassment based on events other than "lesbian" rumors, which were the only specific facts referenced in the charge).

## 3.　**Collateral Estoppel**

Finally, the City argues that Abram is collaterally estopped from re-litigating in federal court the allegations included in her 2004 and 2006 DHR complaints.  Abram counters that collateral estoppel does not apply because the City has "made a very big deal of the 2004 [DHR] charge" and therefore cannot argue for its preclusion, and because there is no final controlling order with respect to either DHR complaint.

The preclusive effect of state administrative findings is governed by New York law.

Kosakow v. New Rochelle Radiology Assocs., 274 F.3d 706, 730 (2d Cir.2001).

> Under New York law, collateral estoppel prevents a party from relitigating an issue decided against that party in a prior adjudication. It may be invoked to preclude a party from raising an issue (1) identical to an issue already decided (2) in a previous proceeding in which that party had a full and fair opportunity to litigate. Additionally, the issue that was raised previously must be decisive of the present action.

Curry v. City of Syracuse, 316 F.3d 324, 331 (2d Cir. N.Y. 2003) (citations and quotation marks omitted).

>     a.    *The 2004 DHR Complaint*

In the 2004 complaint, Abram alleged that she was discriminated and retaliated against in violation of the ADA and HRL when the City declined to assign her to light duty and denied her request for IOD status in November 2003. A four-day public hearing was held, during which Abram was represented by counsel. The DHR considered and rejected each claim. During the pendency of the instant summary judgment motion, the Appellate Division, Fourth Department confirmed the DHR's determination, Abram, 71 A.D.3d 1471, 896 N.Y.S.2d 764, and Abram's subsequent motion for reargument or leave to appeal was dismissed, Matter of Abram v. New York State Div. of Human Rights, 75 A.D.3d 1114, 903 N.Y.S.2d 297 (4th Dep't 2010). Abram does not dispute that she was afforded a full and fair opportunity to litigate her ADA claims of disability discrimination and retaliation, and any objection based on the absence of a final order is now moot.

It is difficult to determine the factual or legal basis for the ADA claim alleged in Abram's complaint. She states only that she first disclosed a disability and requested

accommodation in February 1997, and that "upon reinjury[,] injury [sic] on duty status & light duty denied." (Docket No. 1, ¶¶ 22-23.) To the extent Abram intended to argue disability discrimination at some time prior to May 27, 2003, that claim already has been dismissed. (Docket No. 16.) To the extent she intended to allege retaliation based on the November 2003 denials of light duty and IOD status, that issue already have been decided in the DHR proceeding and would be decisive here. Accordingly, the ADA claim is barred by collateral estoppel to the extent it is based on the same facts litigated before the DHR and on appeal. In sum, the ADA claim is dismissed in its entirety, whether it is intended to allege discrimination, retaliation, or both.

b.   *The 2006 DHR Complaint*

Abram's 2006 DHR complaint alleges retaliation for filing the 2004 DHR complaint. However, her Complaint in this action does not allege any factual basis for a retaliation claim other than, arguably, her already dismissed ADA claim. Beyond that, the predicate for this action is Abram's 2003 EEOC charge, and the 2006 DHR complaint does not allege retaliation related to that charge. Accordingly, it does not fall within the second type of reasonably related claims. Dismissal is warranted for these reasons alone, and no collateral estoppel analysis is required.

\* \* \* \* \* \*

To summarize, Abram's claim that she was discriminated against on the basis of her religion is dismissed in its entirety, as are her retaliation and hostile work environment claims. The race, gender, and age-based disparate treatment claims are dismissed to the extent they are based on conduct occurring prior to July 31, 2003, and on allegedly

discriminatory floating car and school crossing assignments.  The merits of the remaining claims are discussed below.

**B.    Summary Judgment Standard**

Summary judgment may be granted if "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). But "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita v. Zenith, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  The Court resolves all ambiguities and draws all factual inferences in favor of the nonmovant, but "only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769, 1776, 167 L. Ed. 2d 686 (2007).

In the context of employment discrimination cases, the United States Court of Appeals for the Second Circuit has explicitly cautioned district courts to use extra care when deciding whether to grant summary judgment because "the ultimate issue to be resolved in such cases is the employer's intent, an issue not particularly suited to summary adjudication." Eastmer v. Williamsville Cent. Sch. Dist., 977 F. Supp. 207, 212 (W.D.N.Y. 1997) (quoting Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)). Nonetheless, "[t]he summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise

valid motion." <u>Meiri v. Dacon</u>, 759 F.2d 989, 998 (2d Cir. 1985). Indeed, the Second Circuit has noted that "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination cases than to commercial or other areas of litigation." *Id.*

**C.     Abram's Remaining Disparate Treatment Claim Must be Dismissed**

       **1.     *The Applicable Analysis***

It is well settled that where, as here, the plaintiff does not come forward with direct evidence of discrimination, her Title VII and ADEA claims are analyzed under the three-part burden-shifting framework first set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-04, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *See* <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 142-43, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000) (Title VII); <u>Roge v. NYP Holdings, Inc.</u>, 257 F.3d 164, 168 (2d Cir. 2001) (ADEA).

Under this framework, the plaintiff must first establish a *prima facie* case of discrimination by demonstrating that (1) she is a member of a protected class, (2) she is qualified for her position, (3) she suffered an "adverse employment action," and (4) the circumstances of the adverse action give rise to an inference of discrimination. <u>Lawrence v. Nyack Emergency Physicians, P.C.</u>, 659 F. Supp. 2d 584, 593 (S.D.N.Y. 2009) (citations omitted). An "adverse employment action" is a "materially adverse change" in the terms and conditions of an individual's employment. <u>Sanders v. New York City Human Res. Admin.</u>, 361 F.3d 749, 755 (2d Cir. 2004); <u>Galabya v. New York City Bd. of Educ.</u>, 202 F.3d 636, 640 (2d Cir. 2000). It is "more disruptive than a mere inconvenience, and might be indicated by a termination of employment, a demotion evidenced by a decrease in wage

or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." Galabya, 202 F.3d at 640 (quotations, citations, and alterations omitted); *see also*, Pimentel v. City of New York, No. 00 Civ. 326, 2002 U.S. Dist. LEXIS 8454, at *15 (S.D.N.Y. May 14, 2002) ("[W]here there is no loss of salary, benefits, seniority, tenure or promotion opportunities, there is no adverse employment action.").

"The burden of establishing a *prima facie* case of disparate treatment is not onerous. Texas Dep't of Comt'y Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 1094, 67 L. Ed. 2d 207 (1981)). Indeed, the Second Circuit has characterized the burden as "minimal." Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000). If the plaintiff meets this minimal burden, a rebuttable presumption of discrimination arises, and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. Burdine, 450 U.S. at 254. If the defendant succeeds in making this showing, "the presumption of discrimination arising with the establishment of the *prima facie* case drops from the picture." Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000) (citing St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11, 113 S. Ct. 2742, 125 L. Ed.2d 407 (1993)). The burden then returns to the plaintiff.

On Title VII claims, the plaintiff must come forward with "sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the action." Weinstock, 224 F.3d at 42 (citation, quotation marks, and alteration omitted). "In short, the question becomes whether the evidence, taken as a whole, supports a

sufficient rational inference of discrimination." *Id.* But, "[t]o get to the jury, 'it is not enough . . . to disbelieve the employer; the factfinder must [also] believe the plaintiff's explanation of intentional discrimination.'" *Id.* (quoting <u>St. Mary's</u>, 509 U.S. at 519). With regard to ADEA claims, it is not enough to show that age was a contributing or motivating factor of the alleged adverse employment action; the plaintiff must be able to show that age was the "but-for" cause of the adverse action. <u>Gross v. FBL Fin. Servs., Inc.</u>, __ U.S. __, 129 S. Ct. 2343, 2351-52, 174 L. Ed. 2d 119 (2009); <u>Hogan v. J.P. Morgan Chase Bank</u>, No. 09-3048-CV, 2010 U.S. App. LEXIS 24464, at *6 (Nov. 30, 2010).

### 2. *The Remaining Allegations*

The City does not dispute that Abram falls within the protections of Title VII and the ADEA, or that she was qualified for her position. Rather, it contends that she cannot demonstrate the third and fourth elements of her claims that she was denied training and required to fill out P-73 forms, and cannot demonstrate the fourth element with regard to her suspension on or about September 30, 2002. Each is examined in turn.

#### a. *Denial of Mandatory Training*

At her deposition, Abram testified that she was denied mandatory training in 2000 through 2003. She could not recall any specific dates and could recall only generally the topics on which she claims she was denied training. (Tr. 53:10-59:18.) Denial of training can constitute an adverse employment action only where it bears on the plaintiffs opportunities for professional growth or career advancement or directly on compensation. <u>Hill v. Rayboy-Brauestein</u>, 467 F. Supp. 2d 336, 362 (S.D.N.Y. 2006). Abram has offered no evidence in this regard, and the only consequence she testified to that is

arguably connected to her training allegations is that she was unable to gas up her car under her own name.[6] Because Abram has not made even a minimal showing of material harm from the denial of training, she has failed to establish the third element of her *prima facie* case.

Even had she succeeded in that regard, Abram also testified that <u>every</u> officer in her platoon, regardless of their race or age,[7] received the training she was denied. (Tr. 54:13-20.) In light of her own testimony, Abram is unable to prove that she was singled out on the basis of any protected status and has not established the fourth element of a *prima facie* case.

     b.    *Filling out P-73 Forms*

Abram alleged in her EEOC charge that she had "to fill a [sic] P-73 form while similarly situated yonger [sic] Black females are not required to do so." In particular, she testified she was required to fill out this form used for logging explanations and complaints when she reported late to duty. (Tr. 13:4-8.) Abram has not offered testimony or evidence indicating that a requirement to fill out this form is anything more than a mere inconvenience. There is nothing in the record to suggest that filling out P-73 forms resulted in any loss of salary, benefits, seniority, tenure, promotion opportunities, or other material adverse consequence.

And again, Abram testified that "[e]verybody that worked at the E district that was

---

[6] It is unclear from the transcript whether this particular testimony related to the issue of training or whether Abram was attempting to interject a different issue.

[7] Abram was not asked about gender, but she has also testified that she was not the only female officer in her platoon. Therefore, every other female also received the training.

black or white was not called off of they cars to fill out P-73's, was not deemed late every time they blinked they eye." (Tr. 29:2-30:3; *see also*, Docket No. 94 at 8.) Because she has failed to make even a minimal showing that she suffered an adverse job action under circumstances giving rise to an inference of discrimination, Abram has not established the third and fourth elements of a *prima facie* case with regard to P-73 forms.

c. *The Disciplinary Suspension*

The facts of Abram's September 30, 2002 suspension are not in dispute. (Docket Nos. 90 ¶ 21; and 96.) On September 30, 2002, Abram was partnered with Officer Domingo Santiago. The two were having breakfast at Dot's Restaurant when they received a call, at 7:40 or 7:50 a.m., to report to a school crossing about two miles away. As the two officers were preparing to leave the restaurant, they were delayed by the manager who sought help with a problem involving an employee. After they had dealt with that issue, they proceeded to their assignment, arriving at 8:09. Lieutenants Zagara and Bonarek were at the intersection when Abram and Santiago arrived. Zagara asked Abram why they were late getting to the call. She at first refused to answer, and she and Zagara eventually had an exchange which became heated. At one point, Abram keyed the microphone on her radio to broadcast their conversation. Zagara told Abram she was suspended and ordered her to turn over her gun, badge, and ID and return to the station house. Abram initially refused to give her gun, badge, and ID to Zagara, both at the intersection and the station house. She did eventually turn the items in at the station and was suspended for 30 days without pay.

The City concedes that the unpaid suspension was an adverse job action, but urges

that Abram has failed to meet her burden on the fourth element because she has not identified any similarly situated individual who was treated differently. In this regard, the City blatantly ignores the fact that Abram's partner, Officer Santiago, who also was late to the school crossing, was not suspended. That is all that is necessary to create an inference and shift the burden to the City.

The City goes on to argue that it did have a legitimate, nondiscriminatory reason for suspending Abram on September 30—to wit, she was insubordinate while Officer Santiago was not. In support, the City offers an independent hearing officer's findings and recommendation in PSD Case No. 2002-107, which was opened based on the September 30 incident and charged Abram with misconduct for arriving late for the assignment and for insubordination. (Docket No. 96-9.)

As Abram correctly notes, the hearing officer recommended that charges of misconduct for lateness be dismissed because her partner, Santiago, was not charged with misconduct. However, he went on to state that "this case is not fundamentally about the lateness . . . . [I]t is about [Abram's] alleged defiant behavior toward authority, in the person of her supervisor, behavior that rose to the level of insubordination."

Among other things, the hearing officer found Abram refused to respond to Zagara's inquiry as to why she was late, the explanation she eventually offered was not credible or acceptable, she ensured the situation would escalate by accusing Zagara of harassment, broadcasting their conversation, and refusing his direction to turn off her radio microphone, and she "was clearly insubordinate in refusing to hand over her gun, badge, and ID to Lt. Zagara after being repeatedly ordered to do so." (*Id.*)

In arriving at a recommended penalty, the hearing officer noted Abram's length of service, but found it was offset by the seriousness of the insubordination and her history of infractions and disciplinary actions, including six sets of charges over the prior four years brought by a variety of complainants, four of which involved insubordination or extremely discourteous behavior, and all of which were sustained by six different hearing officers. After characterizing Abram as "one who has trouble following rules and adhering to norms of behavior," the hearing officer recommended the most severe available penalty short of termination—*i.e.*, a 60-day suspension.  In short, the hearing officer recommended a lengthier penalty than Zagara had imposed.  Thus, the City has adequately demonstrated a legitimate, nondiscriminatory reason for the 30-day suspension.

The burden again shifts to Abram to come forward with sufficient evidence to support a rational finding that the reason the City gave for the suspension is false, and more likely than not discrimination was the real reason.  Abram's only response is to conclusorily assert that "no other individual in her entire platoon was subjected to the kind of discipline that was exacted upon her."  (Docket No. 94 at 9.)  As she offers no evidence supporting either the falsity of the City's explanation or her disparate treatment, no genuine issue of fact exists and the disparate treatment claim is dismissed in its entirety.

## IV. CONCLUSION

For the foregoing reasons, the City of Buffalo is entitled to summary judgment.

## V. ORDERS

IT HEREBY IS ORDERED, that Defendant's Motion for Summary Judgment (Docket No. 88) is GRANTED.

FURTHER, that the Clerk of the Court is directed to take the necessary steps to close this case.

SO ORDERED.

Dated: January 28, 2011
        Buffalo, NY

/s/William M. Skretny
WILLIAM M. SKRETNY
Chief Judge
United States District Court
